UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                               Plaintiff

v.                                                                   Criminal Action No. 3:24-cr-22-RGJ

CLARENCE ANDREW STIFF                                                                  Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Clarence Andrew Stiff ("Stiff") moves to "Suppress the Buccal Swab Warrant." [DE 61]. The United States responded, [DE 57], and the time to reply has passed. Briefing is complete and the motion is ripe. For the reasons set forth below, Stiff's Motion to Suppress [DE 61] is **DENIED**.

### I.  BACKGROUND

On October 20, 2023, Louisville Metro Police Department ("LMPD") detective Noah Straman ("Straman") applied for a search warrant to collect DNA evidence, including a buccal swab, from Stiff as part of a homicide investigation. [DE 61-1]. Straman sought authority to search Stiff's person to collect "blood, saliva, physiological fluids, hair, fibers, fingerprints, palm prints, footprints, buccal swabs, shoeprints, photographs, [and] relevant clothing." [*Id.* at 318]. In the supporting affidavit, Straman described the steps taken in the investigation and requested a search warrant to obtain Stiff's DNA to "assist investigators in comparing DNA profiles that may have been removed from evidence collected from the initial scene." [*Id.* at 322].

A.  <u>The Search Warrant Affidavit</u>

The affidavit set forth the following allegations. On October 10, 2023, LMPD officers responded to reports of a shooting at 4020 Taylor Boulevard. [*Id.* at 319]. Upon arrival, officers found two victims suffering from gunshot wounds—Branson Crask, who succumbed to his

1

injuries, and Gerald Pointer, who was in critical condition. [*Id.*]. Several items of evidentiary value were collected from the scene, including multiple spent 9 mm casings. [*Id.*]. Straman spoke with the 911 caller, who stated that he had seen a black male wearing a dark hoodie get on a blue BMX-style bicycle and flee the scene. [*Id.*]. Straman reviewed surveillance footage from the area, which showed the suspect traveling toward the scene of the shooting approximately three minutes before the 911 call, and then showed the suspect leaving the area at a fast pace after the shooting. [*Id.*]. The suspect seen in the footage was a black male riding a blue BMX-style bicycle. [*Id.* at 320].

The next day, Straman visited Pointer at the hospital and spoke to him about the incident. [*Id.*]. Pointer stated that he was talking to "B.C." (Brandon Crask), when a male wearing a mask approached on a blue BMX-style bicycle and began shooting. [*Id.*]. Pointer stated that "B.C." had an ongoing feud with a person who goes by "Blaze" and another who goes by "Gee," both of whom live in a nearby homeless encampment. [*Id.*]. Straman searched law enforcement databases for "Blaze" and "Gee" and located a shooting report from 2021 in which the suspect was listed as "Blaze." [*Id.*]. The description of the suspect matched the description of the suspect given by Pointer. [*Id.*]. Upon further review of the case, Straman learned that "Blaze" had been potentially identified as Clarence Stiff. [*Id.*].

On October 16, Straman spoke with an individual who lives in a nearby homeless encampment, who stated that she had heard both that a male with the name "Blaze" had done the shooting and that both victims had shot each other. [*Id.* at 320-21]. That same day, an individual who claimed to be in a dating relationship with Crask contacted Straman. [*Id.* at 321]. She stated that she had been with Crask shortly before the shooting and that a male known as "Blaze" had shown up. [*Id.*]. She explained that Crask and "Blaze" had ongoing problems, and on that day, the two got into an argument, during which "Blaze" threatened to kill Crask. [*Id.*]. She also stated that

2

"Blaze" had made two similar threats to Crask's life in recent weeks. [*Id.*]. She explained that she and Crask were planning to leave town, but needed money, so they planned to shoplift from the Dollar General store and then meet up at a friend's house. [*Id.*]. When Crask failed to show, she went to look for him at the Dollar General, where she observed "Blaze" ride by her on a "small black bike" wearing dark clothes and a backpack. [*Id.*].

On October 19, Straman was contacted by an individual who stated that she had seen "Blaze" that morning (October 19, 2023) riding a BMX style bicycle and that he was armed with a handgun. [*Id.* at 322]. She stated that "Blaze" lives in an apartment on the 2800 block of 7th Street Road. [*Id.*]. Straman showed her a picture of Stiff and she confirmed "with absolute certainty" that Stiff is "Blaze," who she has lived with in the past and has known for approximately one to two years. [*Id.*].

Based upon these facts, Straman requested—and was granted—a search warrant to collect Stiff's DNA. [*Id.* at 324].

B. Execution of the Search Warrant

On October 20, 2023, LMPD detectives received a "wanted" flyer for Clarence Stiff containing photographs of Stiff, identifying information, and a notice that Stiff was wanted for buccal swab collection pursuant to a search warrant. [*see* DE 36, Mot. to Suppress Hr'g Tr., at 128-29; DE 57-3, Wanted Flyer]. On October 27, 2023, LMPD detectives, aware of the active DNA Search Warrant and homicide investigation, observed Stiff at a gas station convenience store located at 3400 Taylor Boulevard. [DE 26 at 69]. Detective Jarrett Goff drove to the gas station and waited in the parking lot with Detective Marks, LMPD Detective Jada Grady, and LMPD Sergeant Joshua Arnwine for Stiff to exit the store to execute the DNA Search Warrant. [DE 36 at 173]. Once Stiff exited the convenience store, detectives ordered him to stop, but Stiff attempted

3

to flee on his bike. [*Id.* at 175]. Stiff was then detained by detectives, upon which he stated that he had a gun on his person. [*Id.* at 136]. Officers then observed the handle of a revolver in plain sight sticking out of Stiff's sweatshirt pocket and removed the revolver. [*Id.*]. Aware of Stiff's record as a felon, Detective Marks arrested Stiff and charged him with fleeing police and possession of a handgun by a convicted felon. [*Id.* at 136, 140]. After Stiff's arrest, another detective—Gary McColpin—served the search warrant on Stiff, and a crime scene unit ("CSU") technician collected the DNA sample. [*Id.* at 142, 155].

    C. Stiff's First Motion to Suppress

Through his previous counsel, Stiff filed a Motion to Suppress all evidence seized as a result of his arrest. [DE 25]. Stiff argued that the DNA search warrant did not give police authority to arrest Stiff, and that his warrantless arrest violated his Fourth Amendment right to be free from unreasonable search and seizure. [DE 25 at 55-56]. Stiff did not challenge the validity of the warrant. The Court, after a hearing on the matter, denied Stiff's motion. [DE 46]. The Court explained that Stiff's initial detention was reasonable to execute the search warrant, and his subsequent arrest was reasonable when Stiff spontaneously admitted that he was carrying a firearm and officers observed the exposed revolver sticking out of his pocket. [*Id.* at 245-46].

## II.    STANDARD

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "Probable cause is not a high bar." *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). It "requires only a probability or substantial chance of criminal activity, not

an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, n. 13 (1983)).

To establish the requisite probable cause for a search warrant, an officer must submit an affidavit containing "facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006). The affidavit must establish a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). When reviewing a finding of probable cause, courts are limited to the "four corners of the affidavit" and should "give great deference" to the issuing magistrate's determination. *Abboud*, 438 F.3d at 571. Moreover, affidavits should be reviewed on a "totality of the circumstances determination, rather than a line-by-line scrutiny." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).

Even if a warrant is found to be invalid, evidence should not be suppressed if police obtained it "in objectively reasonable reliance" on a "subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). *Leon* identified four circumstances in which an officer's reliance on a search warrant would not be reasonable: "(1) the magistrate was 'misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;' (2) the magistrate 'abandoned his judicial role' or neutrality; (3) the warrant was 'so lacking in indicia of probable cause' as to render official belief in its existence unreasonable; or (4) the warrant was so 'facially deficient' that it could not reasonably be presumed valid." *United States v. McClain*, 444 F.3d 556, 564–65 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

### III. DISCUSSION

A. <u>Search Warrant Affidavit</u>

Stiff asserts that the warrant affidavit lacked probable cause for the judge to issue the search warrant and therefore that all evidence obtained as a result of the warrant must be suppressed. [DE 57 at 264]. Specifically, Stiff argues first that the affidavit fails to allege the existence of any DNA evidence found at the scene of the murder against which Stiff's buccal swab could be compared. [*Id.* at 265]. Rather, the affidavit simply states that Stiff's DNA will be compared to "DNA profiles that *may* have been recovered from evidence collected from the initial scene." [*Id.* at 266 (emphasis added)]. With no comparison sample, Stiff argues, there is no "fair probability that any actionable evidence will result from the testing of the evidence found at the scene." [*Id.* at 266]. Stiff also maintains that there are inconsistencies in the testimony collected by Straman and no direct eyewitnesses to the crime. [*Id.* at 265]. He notes that the witnesses mentioned in the affidavit differed with respect to where they believed "Blaze" lived and with respect to who did the shooting, pointing to the fact that one witness stated that she heard the victims shot each other. [*Id.*]. The United States asserts that "the four corners of the affidavit . . . clearly established probable cause to collect a DNA sample."

The affidavit contains numerous facts that establish probable cause to believe that (1) someone who goes by "Blaze" was involved in the murder, and (2) Stiff is Blaze. For example, the affidavit notes that witnesses stated that "Blaze" made death threats against Crask, the two had an ongoing feud, and "Blaze" had confronted Crask with another threat on the day the shooting took place. A witness also stated that she saw "Blaze" riding a BMX style bicycle shortly after the shooting, which matches both the account of the suspect provided by Pointer and security camera footage of the suspect fleeing the scene on a BMX bicycle. The affidavit also states that Straman

6

linked the name "Blaze" to Stiff through a law enforcement database search, and a witness confirmed that Stiff is "Blaze" upon seeing a photograph of Stiff. The affidavit therefore details both the evidence linking "Blaze" to the shooting and linking Stiff to "Blaze." Finally, the affidavit notes that "multiple items of evidentiary value" were collected from the scene of the shooting and states that any DNA recovered from these items would be compared to the sample collected from Stiff. [DE 61-1 at 319, 322]. These facts establish a fair probability that Stiff was involved in the October 10 shooting and that DNA evidence obtained from Stiff would match DNA evidence that may be obtained from the scene of the shooting.

Stiff's argument that a warrant affidavit to obtain a buccal swab must allege the existence of a comparison sample is unavailing. Other district courts have considered and rejected this same argument. *See, e.g., United States v. Wilhere*, 89 F. Supp. 3d 915, 919 (E.D. Ky. 2015) (finding probable cause for a buccal swab because "Defendant is suspected of murder and . . . there might be DNA on the victim's body that could be compared to Defendant's DNA"); *United States v. Cesario*, No. 14-CR-92 PJS, 2014 WL 3577436, at *10 (D. Minn. July 18, 2014) (concluding that the "buccal swab warrant was supported by probable cause because there was a fair probability that the DNA evidence sought would yield evidence of a crime," and defendant's DNA sample was "necessary to compare with 'any DNA that may' be recovered from" handgun). Stiff himself recognizes that "[c]ircuits are split as to whether there is a Fourth Amendment violation when an investigator seizes a suspect's DNA with no evidence against which to compare it." [DE 57 at 266]. And he points to no Sixth Circuit cases supporting his proposition that a comparison sample is necessary to establish probable cause in a buccal swab warrant affidavit. Moreover, such a hard-line requirement would be inconsistent with the "flexible, common-sense standard" of probable cause. *Gates*, 462 U.S. at 239. The affidavit need only show a likelihood that the items sought are

7

"seizable by virtue of being connected with criminal activity" and that "the items will be found in the place to be searched." *United States v. Waide*, 60 F.4th 327 (6th Cir. 2023) (quoting *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016)). In this case, the affidavit shows a likelihood that Stiff's DNA is connected with criminal activity and that the item sought (his DNA) will be found on his person.

The minor inconsistencies in witness statements in the affidavit also do not offset the probable cause established throughout the affidavit. Under the totality of the circumstances approach used to evaluate warrant affidavits, those inconsistencies should not be considered in a vacuum, but in relation to the entirety of the facts presented in the affidavit. *See United States v. Thomas*, 605 F.3d 300, 308 (6th Cir. 2010) (noting that "each element of the affidavit, when viewed in a vacuum, is less persuasive or even insufficient by itself to support probable cause" but when "viewed together and in totality . . . the information contained in the affidavit provided a reasonable basis for believing that evidence of [the crime] would be found"). Stiff notes three inconsistencies: (1) one witness stated that she saw "Blaze" riding a black bicycle, while video evidence suggests the killer was riding a blue bicycle; (2) some witnesses stated that "Blaze" lived in a homeless encampment near the shooting, while one witness stated that he lived in an apartment; and (3) one witness stated that she had that the two victims shot each other, but also stated that a male with the name "Blaze" had done the shooting. [DE 57 at 265-66]. Viewed in the context of the rest of the affidavit, these variations are negligible. Two other witnesses stated that the bicycle was blue, and all three witnesses who saw the suspected shooter stated that it was a small or BMX-style bicycle, making it likely that all three witnesses were referring to the same individual seen in surveillance footage. The location of "Blaze's" abode and the fact that one witness heard that the two victims shot each other likewise do not offset the many other facts

8

pointing to Stiff's involvement, including the ongoing feud between "Blaze" and Crask, "Blaze's" threats to Crask, the fact that "Blaze" was seen leaving the scene of the shooting, and the fact that a witness who personally knows "Blaze" confirmed via a photograph that Stiff is "Blaze."

The lack of an eyewitness to the shooting is also immaterial, as "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). This principle applies equally to Stiff's assertion that "there is no information [in the affidavit] about anyone else Brandon Crask or Gerald Pointer may have had a problem with." [DE 57 at 265]. The affidavit was not required to lay out all possible leads or suspects in the shooting. Judging the affidavit based on what it contains and not what it lacks, it established a "fair probability that evidence of a crime" would be found on Stiff's person. *See Abboud*, 438 F.3d at 571.

B. *Leon* Good Faith Exception

Because the search warrant was supported by probable cause, the Court need not determine whether the *Leon* good faith exception applies. But for the sake of completeness, the Court will analyze whether the exception would apply had the affidavit been found insufficient. Stiff argues that the affidavit is "so lacking in probable cause that it would render official belief entirely unreasonable." [DE 57 at 267]. Again, Stiff notes that the affidavit's failure to point to DNA evidence against which Stiff's sample could be compared renders any reliance on the affidavit unreasonable. [*Id.* at 267]. Stiff also asserts that the *Leon* exception cannot apply when the officers executing the warrant did not actually have possession of the warrant and were relying on a "wanted" flyer. [*Id.* at 268]. The United States argues that none of the four circumstances identified in *Leon* would preclude the exception from applying to the warrant. [DE 61 at 315].

9

Here, there is no evidence that any of the four *Leon* situations apply. First, there is no evidence that the judge who issued the warrant was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" or that the judge "wholly abandoned his detached and neutral judicial role." *Leon*, 468 U.S. at 898-99. The warrant affidavit is also not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* at 899. As the Court has already discussed, the totality of the facts set forth in the affidavit establish a fair probability that Stiff was involved in the shooting and that his DNA would match DNA that may be recovered from the scene. Finally, the warrant was not "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* That is, the warrant did not "fail[] to particularize the place to be searched or the things to be seized." *Id.* Rather, the warrant specified the person to be searched—Clarence Stiff— and the items to be seized—"blood, saliva, physiological fluids, hair, fibers, fingerprints, palm prints, footprints, buccal swabs, shoeprints, photographs, [and] relevant clothing." [DE 61-1 at 318].

Stiff's argument that the "wanted" flyer could not serve as the basis for the initial stop also fails. As the Supreme Court stated in *United States v. Hensley*,

> "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop . . . to detain the person briefly while attempting to obtain further information."

469 U.S. 221, 232 (1985). If an "objective reading" of the flyer would lead an experienced officer to act in reliance on it, "evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop." *Id.* at 233.

In this case, officers were justified in stopping Stiff because they acted in reasonable reliance on a flyer that specifically stated that there was a buccal swab search warrant for Stiff

10

pursuant to a homicide investigation. [DE 57-3]. An objective reading of the flyer reveals that there was a warrant for collection of Stiff's DNA, which an experienced officer would understand to mean probable cause existed to search Stiff. Moreover, that flyer was delivered to detectives only after probable cause has been established and a warrant has been issued, meaning the police who issued the flyer surely possessed "reasonable suspicion justifying a stop." *Hensley*, 429 U.S. at 233. Because the police who issued the flyer had reasonable suspicion justifying a stop and an objective reading of the flyer would lead an experienced officer to act in reliance on it, evidence uncovered during the stop is admissible. While detaining Stiff, detectives discovered a firearm, which, given their knowledge of Stiff's status as a convicted felon, gave them probable cause to arrest him. After the arrest, detective McColpin served the actual search warrant on Stiff and a DNA sample was collected pursuant to the warrant. The fact that detectives who initially approached Stiff did not possess a physical copy of the search warrant does not affect the admissibility of either the firearm found during the initial stop or the DNA evidence collected after Stiff's arrest.

## IV. CONCLUSION

For the reasons set forth above, Stiff's Motion to Suppress the Buccal Swab Warrant [DE 57] is **DENIED**.